FILED
2013 Dec-05  AM 09:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DEBRA PARROTT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:12-CV-3748-VEH** |
| | ) |
| **PNC BANK, NATIONAL** | ) |
| **ASSOCIATION, the successor entity** | ) |
| **to the ROYAL BANK OF CANADA** | ) |
| **d/b/a, RBC BANK SERVICES USA,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION

This is a civil action filed on October 31, 2012, by the plaintiff, Debra Parrott,

against the defendant, PNC Bank, National Association, the successor entity to the

Royal Bank of Canada d/b/a, RBC Bank Services USA ("PNC"), her former

employer.  (Doc. 1, 14, 22).[1]  The Second Amended Complaint, sets out only one

count.  In that count, the plaintiff claims that PNC discriminated against her because

of her age in violation of the Age Discrimination in Employment Act of 1967

("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*, by

---

[1]The original complaint was filed against "PNC Financial Services Group, Inc., the
successor entity to the Royal Bank of Canada d/b/a RBC Bank Services USA."  (Doc. 1). The
defendant's name was changed in subsequent amendments.

> discharging her from her management position and subsequently replacing her with younger, less qualified employees . . .. Alternatively, upon information and belief, RBC Bank imposed a greater level of discipline on Parrott than it imposed on younger similarly situated employees, who violated the same or similar policies . . ..

(Doc. 22 at 6).

The case now comes before the court on PNC's motion for summary judgment. (Doc. 25).  The case is also before the court on PNC's Motion to Strike certain evidence submitted by the plaintiff in opposition to the motion for summary judgment.  (Doc. 38).  For the reasons stated herein, the motions will be **GRANTED**, and this case **DISMISSED with prejudice**.

## I.   STANDARDS

### A.   <u>Motions to Strike</u>

It has long been the law in this circuit that, when deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence.  In 2010, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c)(2).   Although PNC has styled the motion as a motion to strike, the motion is, in substance, a challenge to the admissibility of the plaintiff's evidence. Therefore, the court will treat the motion as an objection under Rule 56(c)(2).

### B.   Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).   The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

3

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact."

4

*Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   MOTION TO STRIKE THE DECLARATION OF THERESA BOACKLE AND PORTIONS OF THE DECLARATION OF GARY WOOD (DOC. 38)

The defendant challenges the admissibility of some of the evidence the plaintiff

has submitted in opposition to the motion for summary judgment. Of course, evidence submitted in support of, or in opposition to, a motion for summary judgment does not have to be admissible under the Federal Rules of Evidence, as long as it could be reduced to an admissible form at trial. *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) *aff'd sub nom. McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997)("We read this statement as simply allowing *otherwise admissible* evidence to be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form."). Still, "an objection [under Rule 56(c)(2)] functions much as an objection at trial . . . . *The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated*." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis added).

Keeping these rules in mind, the court will examine each piece of evidence that is challenged.

## A.   The Declaration of Theresa Boackle (Doc. 34-5)

This declaration is just over two pages long and is offered for the purpose of authenticating two charts, or partial summaries, of the deposition of David Hedges. According to the declaration, Boackle is employed as a legal assistant to plaintiff's counsel, Andrew C. Allen. (Doc. 34-5 at 1). She states that "at Mr. Allen's

6

direction, I read the deposition transcript of David Hedges and summarized those instances in which he indicated a failure of memory in relation to substantive events which relate to matters at issue in this case." (Doc. 34-5 at 3). The defendant argues that this declaration is not based upon the witness's personal knowledge, and attacks these summaries as conclusory opinions by a lay witness. (Doc. 38 at 4-5). The plaintiff responds that "Boackle's declaration simple [sic] serves to authenticate summary evidence already admitted before the Court and is expressly permitted pursuant to 1006 F.R.E. [sic]." (Doc. 41 at 2).

Rule 1006 of the Federal Rules of Evidence provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006. The plaintiff argues that

> Boackle's declaration does not purport to verify or affirm the accuracy of Mr. Hedges' underlying testimony, as PNC speciously argues in its brief. Rather, her testimony simply seeks to authenticate and memorialize the process she undertook in preparing the summaries attached to her declaration as Exhibits "2" and "3." Significantly, PNC had previously submitted Hedges' testimony in support of its Motion for Summary Judgment. . . . Therefore, the underlying evidence reflected in Boackle's charts is already properly before the Court and, in accordance with Rule 1006, F.R.E., and for the Court's convenience may be properly submitted in summary form.

7

(Doc. 41 at 2-3).

The court does not find the plaintiff's argument persuasive. Summaries have been found admissible on summary judgment where "exhibits are voluminous and it would be inconvenient for the Court to take the time to review, compare, and analyze each document." *Guijosa-Silva v. Wendell Roberson Farms, Inc.*, 7:10-CV-17 HL, 2012 WL 860394 at *3 (M.D. Ga. Mar. 13, 2012) (allowing summaries of comparisons of payroll summaries and I-9s because "[t]he payroll summaries consist of line after line of names and numbers that are difficult to understand[, and] [t]he I-9s, though easier to read, are numerous, and it would take time and effort to sort through them and pick out relevant dates and names."). The Hedges deposition is not the type of "voluminous" evidence for which a summary would be appropriate. The deposition can be "conveniently examined in court." The Boackle affidavit, and its attachments, will be **STRICKEN**.

### B.    The Declaration of Gary Wood (Doc. 34-2)

The defendant attacks the following portions of the declaration of Gary Wood:

8.    I am familiar with the Banking Center Performance Standards employed by RBC during my employment as Regional Manager. Having recently reviewed Exhibits 4 and 6 to David Hedges' deposition, I understand that Ms. Parrott was terminated for having authorized on behalf of the Bank a deposit of approximately $12,500, on behalf of a long-time client, Ms. Hallie Riha. Under my supervision, a matter like this would have never bubbled up to an incident to be brought before

8

Human Resources.  To the contrary, had I been informed of Ms. Parrott's actions, I would have commended her for having accurately assessed the risk associated with depositing the check and having made a decision in the best interest of the customer. Indeed, the very provision that RBC and Mr. Hedges cited as a violation of performance standards is entitled "10. Exception Approvals, Overrides &/0r [sic] Transactions outside of approved procedures."  The title of the policy itself acknowledges that occasions exist when exceptions to standard operating policies and procedures do and should occur in order to meet the needs of the Bank's customers. The very purpose of having a Branch Manager is to exercise judgment on such occasions. Of course, in making a judgment call of this nature, a Branch Manager must assess risk as a function of that process. In my judgment, Ms. Parrott did exactly that in this case, and her termination under the circumstances was unwarranted.

. . .

10.     I have reviewed Exhibit 6 to Mr. Hedges' deposition . . . which purports to be the "Dismissal Summary Request" memorializing the reasons justifying Ms. Parrott's termination of employment with RBC. The Dismissal Summary Request is important but misleading for several reasons. First, it demonstrates that Mr. Hedge's [sic] testimony at pp. 95-99 of his deposition, wherein he claims that Human Resources was responsible for the decision to terminate Ms. Parrott, is untrue. The "Dismissal Summary Request" clearly shows that Mr. Hedges recommended her termination, that Human Resources "concurred" in the decision, and that Mr. Stafford approved that decision. Second, the "Dismissal Summary Request" is misleading in that on multiple occasions the document suggests that Ms. Parrott "cashed" the check that Ms. Riha presented, when, as I understand it, the check was in fact deposited into Ms. Riha's account.

11.     Based upon my decades of knowledge and experience in branch banking operations, there is substantially less risk associated with depositing a check of this nature, than there is negotiating the check as a cash transaction. Knowing of the Riha family and its history of

transactions with the Bank, in this case, in my judgment, there was no risk whatsoever to the Bank and anyone knowledgeable of branch banking operations could and should have easily ascertained as much.

. . .

13.   As a former Regional Manager of RBC, it is my professional opinion based upon my training and experience while employed under Mr. Stafford that the reason expressed by Mr. Hedges for justifying the termination of Ms. Parrott is simply unworthy of belief.

(Doc. 34-2 at 5).

The defendant contends that it fired the plaintiff, a bank manager, for not following established written rules and regulations pertaining to endorsing insurance checks in an amount exceeding $10,000.00.  An examination of the argument section of the plaintiff's summary judgment response brief shows that she relies upon Wood's opinion, in part, to establish that she had discretion to act outside the rules in certain circumstances, and exercised her discretion correctly.  The defendant argues that Wood has no personal knowledge of the circumstances surrounding the plaintiff's termination, and that these paragraphs contain conclusory statements and inadmissible lay opinion testimony.  (Doc. 38 at 6).  In response, the plaintiff argues that his testimony is permissible lay opinion testimony under Rule 701 of the Federal Rules of Evidence.  (Doc. 41 at 3-4).  It is undisputed that Wood has not been qualified as an expert.

10

The plaintiff writes only that "[b]ecause the testimony offered by Wood in his declaration meet[s] [Rule 701's] criteria and are clearly helpful to the factfinder in determining a fact in issue (namely the proper application and interpretation of RBC's personnel policies) Wood's conclusions are properly admissible as evidence before this Court." (Doc. 41 at 4).  This conclusory statement does not satisfy the plaintiff's burden.  For this reason alone, the motion should be granted and the declaration stricken.  However, even considering the merits of the argument, the declaration cannot survive.

Rule 56(c)(4) provides

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(4).  Further, a lay witness may only offer an opinion if it is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

> "Rule 701's requirement that the opinion be 'rationally based on the perception of the witness' demands more than that the witness have perceived something firsthand; rather, it requires that the witness's perception provide a truly rational basis for his or her opinion."

11

*Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1201 (3d Cir.1995). "The nature and extent of the contacts and the observations of the witness should be as detailed as possible, but it must be recognized that an adequate foundation for opinion testimony by a layman is established when the testimony discloses that the witness through contacts with the subject had a reasonable opportunity to form an opinion." *United States v. Pickett,* 470 F.2d 1255, 1258 (D.C.Cir.1972).

An opinion is admissible only if the court determines that an adequate foundation has been established. *See* 29 Wright & Gold, *supra,* § 6254 at 145 (collecting cases). The district court determines, under Rule 104(b), whether an adequate foundation has been established to support a finding of rational perception. The court also determines, under Rule 104(a), whether the proffered opinion is based on personal knowledge and will be helpful to the jury. *See United States v. Rea,* 958 F.2d 1206, 1216-17 (11th Cir.1992) (discussing Fed. R. Evid. 104).

*KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1273-74 (M.D. Ala. 2001).  A party's mere "belief" and/or speculation is not based on personal knowledge and is not competent summary judgment evidence.  *See General Longshore Workers v. Pate Stevedore Co.*, 1993 U.S. Dist. LEXIS 18638, *26-27 (N.D. Fla. 1993) (holding that a party's belief does not satisfy the personal knowledge requirement because "[b]elief, no matter how sincere, is not equivalent to knowledge") (*citing Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949)).  According to Fed.R.Evid. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." For a matter to be considered within a witness's personal knowledge, it must be "derived from the

12

exercise of his own senses, not from the reports of others—in other words, [it] must be founded on personal observation" *U.S. v. Evans,* 484 F.2d 1178, 1181 (2nd Cir.1973) (quoting 2 Wigmore, Evidence, 3d ed. 1940, § 657).

In this case, most, if not all, of Wood's opinions are clearly based on technical, or other specialized knowledge within the scope of Rule 702.  He states that his opinions are "[b]ased on [his] decades of knowledge and experience in branch banking operations," (doc. 34-2 at 7) and constitute his  "professional opinion based upon [his] training and experience"  (doc. 34-2 at 8).   To the extent that his opinions are so based, they are inappropriate under Rule 701.

In paragraph 8, Wood states that he was a former Regional Manager for RBC, and that he is "familiar" with "the Banking Center Performance Standards employed by RBC."  (Doc. 34-2 at 5).  In the same paragraph he then opines that "[t]he title of the policy itself acknowledges that occasions exist when exceptions to standard operating policies and procedures do and should occur in order to meet the needs of the Bank's customers."  (Doc. 34-2 at 6).  First, the policy language, what little there is, speaks for itself.[2]  Second, Wood's opinion as to what the policy allows is clearly based on specialized knowledge as a former Regional Manager, and will not be

---

[2]Wood does not discuss how the policy had been implemented <u>in practice</u>.  He only gives <u>his opinion</u> as to what <u>the language</u> cited to the court means.

considered as lay opinion testimony.  For the same reasons, the court will not consider his opinions that the "very purpose of having a Branch Manager is to exercise judgment on such occasions," "in making a judgment call of this nature, a Branch Manager must assess risk as a function of that process," and that "[i]n [his] judgment, Ms. Parrott did exactly that in this case, and her termination under the circumstances was unwarranted."

Wood also lacks personal knowledge of the circumstances behind the plaintiff's termination.  Although he was a former Regional Manager for RBC, it is undisputed that he left the defendant no later than April 2011.  Accordingly he was not employed by the defendant on October 19, 2011, when the plaintiff was terminated.  (Doc. 22 at 5).  While he may be "familiar" with the plaintiff's "performance as a Branch Manager," and "the Banking Center Performance Standards employed by RBC," he was not there when the events giving rise to her termination occurred.  Indeed, everything he knows about the incident he learned from his review of exhibits to the Hedges deposition.  (Doc. 34-2 at 5).  Even then, he premises his opinion on an incorrect assumption, saying: "I understand that Ms. Parrott was terminated for having authorized on behalf of the Bank a deposit of approximately $12,500, on behalf of a long-time client, Ms. Hallie Riha."  (Doc. 34-2 at 5).  The dispute in this case centers upon whether the plaintiff violated RBC's

14

policies regarding endorsing <u>insurance</u> checks.  The defendant agrees that there are different policies relating to different types of checks.  However, it is undisputed that there was a specific policy regarding <u>insurance</u> checks in an amount over $10,000. The foundation for Wood's opinion is not sufficient for him to opine that the plaintiff acted reasonably, or was disciplined properly.  Without a proper foundation, his testimony is not "helpful," but instead is an opinion offered to "*merely tell the jury what result to reach.*" *United States v. Rea,* 958 F.2d 1206, 1215 (2d Cir.1992) (quoting Fed. R. Evid. 701 Advisory Committee Note on 1972 Proposed Rule) (emphasis supplied); *see also Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 912 (2d Cir.1997) (same); *see also, Hamilton v. Coffee Health Grp.*, CV-10-S-3621-NW, 2013 WL 2635304 at *3 (N.D. Ala. June 6, 2013) (Smith, J.).

Paragraph 10 is merely an impermissible conclusory lay opinion as to what the documentary evidence in this case demonstrates.

Paragraph 11 is an opinion made "[b]ased on [Wood's] decades of knowledge and experience in branch banking operations." (Doc. 34-2 at 7).  It is therefore based upon specialized knowledge and will not be considered as lay opinion.  For the same reasons, paragraph 13 which states Wood's "professional opinion based upon [his] training and experience,"  (doc. 34-2 at 7, 8) is also due to be stricken.

The above quoted paragraphs of the Wood declaration will be **STRICKEN**.

15

## III.   MOTION FOR SUMMARY JUDGMENT

### A.   <u>Facts</u>[3]

#### 1.   *Debra Parrott*

The plaintiff, Debra Parrott, was born on June 30, 1954.  She was 59 years old when this motion was filed.  Parrott began her banking career in 1996 as an Assistant Branch Manager for Birmingham's AmSouth Bank N.A.  It is undisputed that she distinguished herself by opening a new branch located in Vestavia Hills, Alabama, while capturing 640 new households in the first six months of that branch's operations.

Parrott joined National Bank of Commerce ("NBC") on February 5 or 6, 2002.  Beginning on January 1, 2003, Parrott served as Branch Manager of NBC's Hoover Crossings branch office in Hoover, Alabama.  On or about April 1, 2005, NBC promoted Parrott to Vice President and later transferred her to the Pelham Banking Center, in Pelham, Alabama, as the Banking Center Manager.  On January 16, 2007, NBC promoted Parrott to Area Sales Manager, where her responsibilities included,

---

[3]The "facts" set out herein are presented, as this court must, in the light most favorable to the non-movant.  The court has reviewed the facts proffered by the parties and, to the extent that a fact was not disputed, has included that fact exactly as proffered, and without citation.  To the extent that a fact was disputed, and the dispute was accompanied by a specific citation to evidence which supports the dispute, the court will cast the fact in the light most favorable to the non-movant, and include a citation to the record.  All citations to the record will be to the court document and page number as it appears in the record, *i.e.* doc. 4 at 2.

among other things, business growth and staff development for five Birmingham area branches, while collaborating with the Consumer Banking Manager and other department heads to assist in achieving the institution's strategic goals.

NBC eventually was renamed First American Bank ("First American").  On February 5, 2008, RBC acquired the Alabama National BanCorporation, a bank holding company that owned First American, and Parrott became an employee of RBC.  Parrott retained the title of Vice President and continued in her role as Banking Center Manager in the Pelham, Alabama branch.  Parrott's responsibilities as an RBC Branch Manager included, among other tasks, overseeing branch operations, supervising and managing branch employees, and sales production (i.e., growing the branch's loans and deposits).  As Branch Manager, Parrott was required to know and follow RBC's policies and procedures in order to minimize risk to the Bank.  During her employment, RBC trained Parrott on its policies and procedures, which were also available to her to reference online.  Throughout her employment, Parrott's supervisors consistently rated her performance as "Outstanding" and "Achieving."

### 2.   *Gary Wood*

At the start of her employment with RBC, Parrott, along with fourteen other Branch Managers in the Birmingham Region, reported to Regional Manager Gary Wood.  (Doc. 27-1 at 65).  Wood reported to Regional President Scott Stafford.

Throughout his employment, Wood always received performance ratings of "High Performing." Wood testified in his declaration that, "even according to the exacting standards of my Regional Manager, . . . Stafford, my periodic performance evaluations perennially demonstrated that I completed all of [my] tasks with at least a satisfactory if not better rating." (Doc. 34-2 at 4).

Stafford testified that he did quarterly performance evaluations on Gary Wood as a manager and, when asked to rate him as a regional manager he stated:

> I believe Gary was always in what we would call the high performing, which was the middle -- we had five different buckets. We have exceptional, outstanding, high performing, developing, and does not meet in order. And I believe every evaluation that Gary and I had was in the high performing, which was that middle.

(Doc. 27-2 at 38). Stafford called this range "the middle bucket," saying "[i]t was not excellent. It wasn't outstanding. It was a high performance rating and it was middle of the road, I guess you would say. And there were opportunities clearly for them to do better." (Doc. 27-2 at 116).

In March or April 2011, Wood voluntarily tendered his resignation for purposes of pursuing other business opportunities with a competing bank.

### 3.   *David Hedges and the Performance of the Birmingham Market*

On March 30, 2011, RBC Bank hired David Hedges, born in 1968, as Regional Manager to replace Wood, and directed Parrott and other Birmingham area Banking

Service Managers to report to him.  Hedges was a former District Manager at Wells Fargo.  Hedges testified that he was brought in to improve production because: "My predecessor [Wood] had failed and failed miserably over a period of time which was proven by the results Birmingham [sic] having the most opportunity basically of any of these districts and yet was consistently at the bottom."  (Doc. 27-3 at 206).  He stated that, out of the seven districts "[a]fter I was there for -- I want to say four months we were number two. After I was there six months we were in a battle for number one, and ranked number one or two the rest of the year."  (Doc. 27-3 at 206).

> Q.    Did you ever know Gary Wood?
>
> A.    I've never met Gary Wood to the best of my knowledge.
>
> Q.    Did you formulate any kind of opinions about what kind of regional manager he was?
>
> A.    From coaching notes, from speaking with peers of his, with speaking with my manager, with speaking to Jack Wiley, several others in observations about things that were going on in the branches, I did not consider him a very good regional manager.

(Doc. 27-3 at 93).

When asked in her deposition, "[i]sn't it true that the Birmingham market was one of the lower-performing markets in Mr. Stafford's geographical territory in the 2010/2011 time frame," the plaintiff stated, "That's what we were told, yes."  (Doc. 27-1 at 20).  Indeed, Stafford testified that he told <u>Hedges</u> that, <u>when Hedges was</u>

19

over the region, "there were certain areas where the region was the worst performer or sub performance was within the region . . .." (Doc. 27-2 at 116).   Stafford stated that he was referring to the areas of "consumer loan growth" and " [p]robably checking account production."  (Doc. 27-2 at 116).

### 4.     *The Plaintiff's Performance Rating*

The plaintiff's performance was measured by the four-pillar metrics of "operational effectiveness," "productivity," "financial," and "client relationship. In 2009 and 2010, Wood assessed Parrott's performance as "Outstanding," even though her branch fell short of its performance goals.

In June 2011, Hedges dropped Parrott's performance rating from the "Outstanding" level she had attained in March 2011 under her previous supervisor to "Deficient." (Doc. 34-1 at 3).[4]   However, the numbers used by Hedges as the metric for his assessment were inaccurate. (Doc. 34-1 at 3). In his deposition, Hedges agreed that data upon which the assessment was made was "all pulled and inputted for [him] by [his assistant] Sherry Upshaw." (Doc. 27-3 at 222). He agreed that there was "something that was wrong." (Doc. 27-3 at 222). Less than twenty (20) minutes after Parrott raised with Hedges the miscalculation in her performance

_____

[4]Parrott cites this as an example of how Hedges targeted her, and other older Branch Managers for termination.

review, he corrected the error and raised her performance rating to "Outstanding."

**5.**   ***The Insurance Claim Endorsement Incident***

On October 7, 2011, a customer named Hallie Riha came into the Pelham Banking Center holding an insurance check for $12,464.37, made payable to both herself and the bank.[5]  (Doc. 27-1 at 27, 262).  She asked the plaintiff to endorse the check on behalf of the bank so that she could deposit it into her account.  (Doc. 27-1 at 25).  The following exchange took place in the plaintiff's deposition concerning that incident:

Q.   . . . [W]hat does she tell you?

A.   She had actually called me previously.

Q.   When did she call you?

A.   I don't know if it was the day before, the week before. At some point previous to her arrival, to coming into the branch she had called and said that she had an insurance reimbursement check where she had some storm damage to her roof that she had already repaired because she didn't want to wait for the check and that she just wanted to deposit it and would I okay it. She said I've been to another branch. They want me to jump through a bunch of hoops. I just want to deposit the check because the work has already been done. I said fine, Come on in. I'll take care of you.

Q.   And did she come in the day she called?

_____

[5]The bank was listed as a payee because it held a mortgage on the property which was the subject of the insurance claim.  (Doc. 27-1 at 27).

A.   No, she did not. It was several days later, maybe even a week later. I was having an event at the bank in our branch, fall open house. There were quite a few guests there, customers. There was a lot of food out, people eating. Came in and said I'm here with the check, can you okay it so I can deposit it?  I said sure.

Q.   Okay.

. . .

Q.   So you endorsed the check?

A.   I did.

Q.   Did you ask her any more questions?

A.   I didn't.

(Doc. 27-1 at 194-195).  The plaintiff testified that the customer had banked at the branch for "[t]wenty-plus years," that the plaintiff was friendly with her during work hours, and that the plaintiff knew her family.  (Doc. 27-1 at 26, 27).  She, and her former supervisor Wood, personally knew and were familiar with the character and integrity of Riha.

In an affidavit, the plaintiff states:

I endorsed the check on behalf of RBC for Ms. Riha in order to for her to deposit the check into her long-standing account. The reasons that I endorsed the insurance claim check were twofold: (1) The customer was one with whom I had been familiar for many years, who also consistently maintained a significant balance in her account far exceeding the face value of the check, she had always demonstrated good character and integrity, and she and her family had a long-standing relationship with the bank; and, (2) I knew without hesitation that if she

22

told me the work for which the check she sought to deposit had been performed, without question it had been done. In addition, her parents and their family business were long-standing, valued customers of the Bank with more than sufficient assets deposited in the Bank's accounts such that the bank had unquestionable recourse in the unlikely event the check was returned. Finally, the risk to the Bank was essentially non-existent, because I only approved the check for **deposit**, and not for purposes of negotiating a cash transaction.

(Doc. 34-1 at 4-5) (emphasis in original).

RBC suffered no loss as a result of this incident.

### 6.   *RBC's Policy Regarding Insurance Claim Settlement Checks*

The plaintiff testified that at the time she endorsed the check she was aware that RBC had a policy regarding insurance claims checks, and that she knew the policy applied to her.  (Doc. 27-1 at 195-196).[6]  The policy outlined for employees the required procedures prior to endorsing insurance settlement checks for customers in which RBC held a lien on the property.  Typically, insurance settlement checks are for repairs to property damage (i.e., storm damage), and the payees on the check are both the owner of the collateral and RBC, the holder of the mortgage.  Branch Managers were required to follow the procedures outlined in RBC Insurance Claim Checks policy to ensure that the repair work on the property was actually done, and to minimize the risk of loss to the Bank.

---

[6]When asked in her deposition if she had seen the document before she stated: "I can't say that I did. I'm sure I was supposed to have, but I can't say that I did."  (Doc. 27-1 at 196).

23

Before endorsing an insurance settlement check, depending on the amount, employees were required to follow certain procedures and obtain documents from the customer under the Insurance Claim Check policy.  For insurance settlement checks over $10,000, such as the one in the instant case, the Insurance Claim Check policy required an employee to obtain: 1) a customer affidavit from the borrower certifying that the repairs to the property have been or are in the process of being completed; and 2) a copy of the insurance adjustor's report.  Per RBC's Insurance Claim Check policy, RBC's Retail Loan Operations in North Carolina, not the branch offices, were to handle settlement checks over $10,000. Branch employees, for insurance settlement checks over $10,000, were tasked with gathering and forwarding the following six items to RBC's Retail Loan Operations department:

– The original check endorsed by the borrower(s). The loan officer should NOT endorse the check.

– The Customer Affidavit (damage over $10,000) completed and signed by the borrower(s). The form must be notarized.

– A copy of the insurance adjustor's report.

– Assignment of Deposit Account Agreement completed and signed by the borrower(s) (a disbursement account).

– Retail Loan Operations Information to Setup Checking Account (for repairs that have not been completed).

– A copy of the Contract/Estimate of Repairs.

24

(Doc. 27-1 at 261) (emphasis added). Per this bank policy, for settlement checks over $10,000, the branch employee was also required to advise the borrower, among other things, that: 1) Retail Loan Operations will issue a check to the borrower and the contractor once an inspection of the property has been ordered; and 2) after the repairs are made, the contractor and borrower will be required to complete and sign a Certification of Completion stating that all repairs are complete. (Doc. 27-1 at 261). RBC's Insurance Claim Checks policy also provided, "Failure to follow the below procedures may result in Disciplinary Action per the advice and guidance of the HR Service Center up to and including termination." (Doc. 27-1 at 259) (emphasis added).

Parrott acknowledges that she had dealt with RBC's Retail Loan Operations during her employment, and that she had access to Retail Loan Operations' phone number, which is also written on the policy. Parrott also acknowledges that Retail Loan Operations, and not the branch office, should handle insurance settlement checks over $10,000, like the one at issue in this case. This policy was available to Parrott online, the policy applied to her, and she admits that she should have followed the procedures. She also admits that she did not. (Doc. 33 at 34 (discussing the plaintiff's "admitted failure to follow the RBC Insurance Claims Checks policy").

The following exchange took place in the plaintiff's deposition:

Q.    (MR. LIEBERMAN:) You did not follow the bank's written procedures or guidelines prior to endorsing the check. Is that correct?

A.    I did not follow those particular procedures and/or guidelines. However, what I did do is use the discretion afforded to me as a Banking Center Manager slash Vice President to know my customer and mitigate risk to the bank in that manner.

Q.    Is there anything in those written procedures -- and I'm sure you've reviewed them and I'll show them to you later. But are you aware of anything in those procedures that has an exception for a Banking Center Manager's knowledge of their customer to not follow those procedures?

A.    When I -- at the time, I did not know that. More recently when I have reread the policies as they've been provided by RBC, yes, I see that there is no exception for a Manager. However, I want to expand on that to say that the banking center standards do allow for a Manager's discretion within their authority.

Q.    The banking center standards. What --

A.    Yes.

Q.    Where are those?

A.    That's what RBC used to fire me --

Q.    Okay.

A.    -- is a violation of RBC banking standards.

Q.    But as far as you know there is nothing in the procedures or guidelines regarding the endorsement of insurance checks that allows for management discretion. Is that right?

A.    At the time, I did not know that.

26

Q.     Do you know that now?

A.     I do.

(Doc. 27-1 at 31-33).

### 7.     *Other Check Cashing Policies*

Hedges was questioned in his deposition about a check cashing policy produced in discovery that states: "Ultimately, the Manager has the authority to make all final decisions as to whether a check should be cashed or not… . When a client wants to cash a not on-us check, your decision will be influenced by the client's overall relationship with our Bank. Whenever there is a question about cashing a check, remember to review the client's overall relationship…" (Doc. 35-2 at 3). Hedges agreed that this "appear[ed] to be a policy governing how tellers should seek approval for cashing not-on-us checks," but stated that "[t]his would be mainly for consumer and small business; would not pertain necessarily to insurance checks." (Doc. 27-3 at 134).   He stated that the policy statement was consistent with his understanding of a manager's authority "[f]or the type of check that is being described," "consumer or small business, but not insurance." (Doc. 27-3 at 135).   He also described this policy as pertaining to "[g]eneral checks that come through the bank, consumer checks, what you might call personal small business checks." (Doc. 27-3 at 136-137).   He was clear that they have a separate policy for insurance checks.

27

(Doc. 27-3 at 135-136).

**8.      *On October 19, 2011, RBC Terminated Parrott's Employment***

Shortly after RBC discovered that Parrott had endorsed the insurance settlement check without following the required procedures, a human resources representative advised Hedges to ask Parrott about the circumstances surrounding her endorsement.  When Hedges questioned Parrott, Parrott told him that there were a lot of things that she was supposed to do before cashing the check, but she signed off on it because the person was a good customer and friend.[7]  (Doc. 27-1 at 204).

In the dismissal summary request, Hedges wrote that <u>he</u> recommended dismissal.  (Doc. 27-3 at 246).[8]  When discussing in his deposition who made the recommendation Hedges stated:

> I recommended -- I called HR.  HR and I conferred. I went to talk to Ms. Parrott in whatever order of events is, I made my manager aware, HR and I discussed several times, so they recommended to me the dismissal. I talked to my manager, Scott.  He agrees with that. I agree with it. We were all in agreement.

---

[7]In her affidavit, the plaintiff states that the customer "was not a 'friend' in the sense that Mr. Hedges attempted to portrait [sic] her in his deposition.  She and her family were long time customers of the Bank and they therefore were treated as friends, but we never socialized outside of the setting of the Bank business."  (Doc. 34-1 at 5).   In her deposition, she was clear that she told Hedges that she said that the customer was a friend.  She did not give this additional explanation to Hedges.

[8]See also, document 23 (Answer to Second Amended Complaint) ("Defendant further admits that Hedges recommended Parrott's termination, and that human resources and Scott Stafford, who, at the time, was a Regional President, Retail Banking, concurred with the decision.").

28

> When they wrote this up for me -- because it is in legalese or whatever, designed I think to protect us from something like this -- of course, it's me. It's me signing the paper. It's Scott signing the paper. Of course it is. But that -- did I recommended it initially? I don't know how it started. They recommended it to me; I agreed with it. So ultimately however you say it, whether I recommend or agree with it.

(Doc. 27-3 at 125-126).  It is undisputed that, no matter who recommended it, that

Stafford and the HR department agreed with the decision to terminate the plaintiff.

> Hedges stated that he was "disturbed" because:

> Debbie said this person was a friend. We're not to make any judgment towards our friends versus any other customer or clientele that we wouldn't do for someone else. That would be across the board. So that was disturbing in the fact.

> [Also] that, you know, she admitted that she did not follow proper policy and procedure with this person. And it put the bank at risk from my understanding for several reasons. One is that if the check ever came back or if they found out that we did not use proper procedure in cashing this check or allowing the customer to have the funds the insurance company that issued the check could come back at any time and claim those funds back from us whether or not the work was completed or not.

(Doc. 27-3 at 102-103).

### 9.    *The Dismissal Summary Request*

On the Dismissal Summary Request signed by Hedges, he wrote as the reason

for dismissal: "[Banking Center] Performance Standards Infraction #10." (Doc. 27-3

at 245).  This statement refers to another form, created by RBC, which contains a

"non-exclusive list of specific job performance infractions banking center employees

must avoid, as well as the recommended corrective action steps to be taken by RBC management in response." (Doc. 27-1 at 263). The form is clear that "[t]hese Standards do not create a progressive disciplinary system, and RBC reserves the right at all times to exercise its full discretion, subject to the needs of the business under the particular circumstances, when following or deviating from these Standards." (Doc. 27-1 at 263). Infraction ten reads:

> Exception Approvals, Overrides &/or Transactions outside of approved procedures guidelines &/or Authorized Limits, - Employee's [sic] must understand their authorities and the accountability to maintain the integrity of all decisions made.

(Doc. 27-1 at 264) (emphasis in original). The recommended corrective action taken includes a written warning for the first occurrence, probation for the second occurrence, and dismissal for the third occurrence. (Doc. 27-1 at 264). The recommendation of "dismissal" has an asterisk which leads the reader to a note which reads: "Dismissal: Each situation will include a review of the circumstances and the employee's prior corrective action and performance record." (Doc. 27-1 at 264.)

This incident constituted Parrott's first occurrence of a Performance Standard violation. It is undisputed that Hedges made no effort to assess the risk to the bank or to review "the circumstances and the employee's prior corrective action and

30

[Parrott's] performance record."[9]  He states that her performance was not considered because she made "a decision that was . . . against policy and procedure." (Doc. 27-3 at 111).  In Stafford's deposition, counsel stated: "I understood the policy to be that certain violations of policy might be mitigated based upon either -- well, both the risk to the bank, the bank's exposure, and given the employee's past performance." (Doc. 27-2 at 51).  Stafford responded: "If you're speaking of performance, history is absolutely a part of reviewing their, you know, current performance. You look at past performance." (Doc. 27-2 at 51).  He stated that, in the plaintiff's case, they did not review her performance because her termination had "nothing to do with her performance," but was conduct related.  (Doc. 27-2 at 120).

On October 19, 2011, Hedges informed Parrott, age 57 at the time, that her employment was terminated.  On November 22, 2011, a little over one month after Parrott was discharged by RBC, Iberia Bank hired Parrott as a Branch Manager.

Parrott has no knowledge of any other RBC employees who did not follow RBC's Insurance Claim Check policy, or who incurred a potential loss in any transaction of over $12,000, and were treated more favorably.

---

[9]Parrott disagrees with RBC's business decision to terminate her employment and claims that the Bank, under its Banking Center Performance Standards had the discretion to give her a lesser form of discipline, like a written warning, based on her prior performance.  RBC Bank policy and procedure affords its management discretion to impose a range of disciplinary actions for alleged policy or procedural violations.

**10.**   *Miscellaneous Facts*

It is undisputed that, in Parrott's absence, RBC Bank hired a substantially younger and objectively less experienced employee, Amber Renda (born July 1980), to serve as Banking Center Manager at its Pelham Parkway branch until Renda was terminated on December 12, 2011.  She was terminated by Hedges, at the age of 31, for a policy violation.[10]   (Doc. 27-6 at 3).

Parrott does not allege or have any evidence in support of her discrimination claim, that the decisionmakers, Stafford (age 41) and Hedges (age 44), made any comments about her age.

In her deposition, the plaintiff claims that Hedges favored younger Branch Managers based on his "body language" at meetings and her perception that he was more critical of her and the older Branch Managers that reported to him.  The following exchange took place in her deposition:

---

[10]The plaintiff stated in her deposition that she knew Renda was less qualified because the plaintiff trained her.  (Doc. 27-1 at 109).  The plaintiff also proffers:

> That employee was so notably unqualified that RBC subsequently terminated that employee and replaced her with yet another substantially younger and less qualified employee as Branch Manager. (Defendant's Answer to Second Amended Complaint (doc. 23), ¶ 16; Defendant's Exh. A, Parrott depo., pp. 108-109).

(Doc. 33 at 28-29).  The citations provided do not support <u>this</u> fact.  Accordingly, it will not be considered by the court.

A.     Mr. Lieber, as I said, David -- every conversation I had with David, whether it was over the telephone, whether it was in my office, whether it was on a business call was very uncomfortable. He was accusatory. He -- he monitored every single thing that I did. He made notes of -- and he pointed them out to me, you were five minutes late on a call. He didn't ask why.

Q.     Do you know if he did that with younger employees as well?

A.     I have no idea what he did.

Q.     Do you have an idea of any facts that he treated younger employees better than you or favorably?

A.     I know that he was nicer in a group to the younger employees than he was.

Q.     But beyond that you have no idea one way or the other?

A.     I don't know. I was not privy to what he did with them.

Q.     Now, other than those circumstances and the general tone of his conversations with you, any other incidents of discrimination that you're claiming as part of your lawsuit?

A.     No, no.

(Doc. 27-1 at 100-101).

As a manager, Parrott was required to report internal incidents of discrimination.  However, prior to her discharge, she never contacted RBC's Human Resources department to complain about discrimination. (Doc. 27-1 at 75).

In September 2011, after taking over the Birmingham Region, Hedges discharged Branch Managers Tommy McCain and Joey Pitts, ages thirty-two (32),

and thirty-three (33), respectively, for their performance. (Doc. 27-6 at 3).  Troy Ball, (who is in his late 20s or early 30s) replaced McCain.  (Doc. 27-3 at 48-49).  Also in September 2011, Branch Managers Teresa Wilson and Debbie Roberson resigned their employment at ages fifty-three (53) and fifty-six (56), respectively, after Hedges placed each of them on probation for their performance.  On July 20, 2012, Hedges discharged Branch Manager Thelma Vanderburg at the age of sixty-eight (68) for making inappropriate comments during the recruitment process about an African-American job candidate.

None of the older Branch Managers, Roberson, Wilson, Vanderburg or Parrott, ever heard Hedges make any comments about their age.

Hedges hired "Managers in Waiting" (also called "hire-aheads") even though there were no open available Banking Center Manager vacancies to be filled. (Doc. 27-3 at 72-73).  The following exchange took place in his deposition:

> Q.    Can you think of any reason why in May of 2011 you would be hiring banking center managers if you had no vacancies?
>
> A.    Potentially -- either we had a vacancy, potentially I had a letter of resignation given a certain time, I hire ahead. There could have been several reasons, and I don't know for which one.
>
> Q.    Well, in May of 2011 were you anticipating the termination of existing banking center managers?
>
> A.    I cannot remember.

Q.     It's possible; you just don't recall sitting here today?

A.     That is correct. I do not remember.

(Doc. 27-3 at 80-81).[11]

B.     **Analysis**

The ADEA prohibits employers from discharging, or otherwise discriminating

against, an employee who is at least 40 years of age because of that employee's age.

29 U.S.C. §§ 623(a)(1), 631(a).  Early this year the Eleventh Circuit set out the

following standard under which to review ADEA claims:

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an
employer ... to fail or refuse to hire or to discharge any individual or

---

[11]The plaintiff proffers the following fact:

15. Simultaneously, a few months after assuming his role as Regional Manager,
Hedges began terminating and or forcing the resignations of older loyal, long-term
employees by placing them on performance improvement plans that were impossible
to meet, including Teresa Wilson (born July 11, 1955; resigned September 10,
2011)(Defendant's Exh. G, Wilson depo., pp. 8, 17-18, 45-46, 51- 54), Debbie
Roberson (born July 26, 1955; resigned September 6, 2011)(Defendant's Exh. D,
Roberson depo., pp. 7, 19, 44-61, 62-64, 93-94), and Thelma Vanderburg (born
September 7, 1943; terminated July 20, 2012)(Defendant's Exh. G, Vanderburg
depo., pp. 11, 14; Plaintiff's Exh. A., Parrott Aff., ¶ 6; see also, Defendant's Exh. C,
Hedges depo., pp 40-51 and Plaintiff's Exhibit E, Boackle declr., Exh. 3).

(Doc. 33 at 22-23).  The court's scheduling order requires that "[a]ll statements of fact must be
supported by specific reference to evidentiary submissions."  (Doc. 3 at 16).  The conclusory
statement that Hedges was "forcing" resignations, by placing these employees on "performance
improvement plans that were impossible to meet," is followed by citations to many deposition
pages, covering several topics.  Further, lumping all the employees together in one fact  adds to
the confusion.  Such does not qualify as a "specific" reference.  This "fact" will not be
considered by the court.

otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Id.* § 623(a)(1). In *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 176, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009), the Supreme Court held that the language "because of" in the ADEA statute means that a plaintiff must prove that discrimination was the "but-for" cause of the adverse employment action. . . ..

A plaintiff can establish age discrimination through either direct or circumstantial evidence. *Mora v. Jackson Mem'l Found., Inc.,* 597 F.3d 1201, 1204 (11th Cir.2010). Prior to *Gross,* we consistently evaluated ADEA claims based on circumstantial evidence of discrimination under the burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). . . ..

Following *Gross,* we have continued to evaluate ADEA claims based on circumstantial evidence under the *McDonnell Douglas* framework. *See Kragor,* 702 F.3d at 1308, 2012 WL 6618360, at *2. . . . But the *McDonnell Douglas* framework does not shift the burden of persuasion to the defendant; instead, once the employee establishes a prima facie case of discrimination, the burden of *production* is shifted to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Tex. Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). If the employer offers a legitimate, non-discriminatory reason, the employee is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. *See id.* at 256, 101 S.Ct. at 1095; *see also Kragor,* 702 F.3d at 1308, 2012 WL 6618360, at *2. Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) ("It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against remains at all times with the plaintiff.' ") (citation omitted); *see also Willis v. Conopco, Inc.,* 108 F.3d 282, 286 (11th Cir.1997).

*Sims v. MVM, Inc.*, 704 F.3d 1327, 1331-33 (11th Cir. 2013).

Is has been recently noted that

[t]here is more than one way to establish a prima facie case of discriminatory discharge under the ADEA. For example, a plaintiff may "show that [ ]he (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback v. Florida Bd. of Educ.,* 381 F.3d 1230, 1235 (11th Cir.2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Alternatively, a plaintiff may show "(1) that he is a member of a protected class ...; (2) that he was qualified for the position he held; (3) that he was discharged from that position; and (4) that in terminating his employment, his employer treated him less favorably than a similarly situated individual outside of his protected class...." *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1325 (11th Cir.2011) (citing *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir.2003), in turn citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

*Cobia v. Stryker Sales Corp.*, 2:13-CV-01802-RDP, 2013 WL 5935106 *3 (N.D. Ala. Nov. 5, 2013) (Proctor, J.).  The plaintiff pleads both theories in the alternative.[12]

---

[12]The Second Amended Complaint states:

Defendant discriminated against Plaintiff because of her age by discharging her from her management position and subsequently replacing her with younger, less qualified employees in violation of the ADEA. Alternatively, upon information and belief, RBC Bank imposed a greater level of discipline on Parrott than it imposed on younger similarly situated employees, who violated the same or similar policies, in violation of the ADEA.

(Doc. 22 at 6).

In this case, the defendant does not argue that the plaintiff has failed to make out a prima facie case.  Instead, the defendant "assumes" the prima facie case and proffers, with supporting evidence, the following reason for her termination: "RBC terminated Parrott's employment because she admittedly disregarded RBC's policy regarding the approving of insurance settlement checks by endorsing a settlement check for a friend in the amount of $12,464.37."  (Doc. 26 at 20).

The burden now shifts to the plaintiff to show that the defendant's proffered reason is a mere pretext for discrimination.  The court will examine each of the plaintiff's arguments in turn.

### 1.    *The Language of the Infraction*

The plaintiff first argues that the defendant's reason is unworthy of credence because "[Banking Center] Performance Standards Infraction #10," which Hedges cited as the reason for her dismissal (see doc. 27-3 at 245), contemplates that exceptions to normal procedure would occur.  Accordingly, the argument goes, the plaintiff should not have been fired for failing to follow established procedures regarding the insurance check.

Infraction ten reads:

Exception Approvals, Overrides &/or Transactions outside of approved procedures quidelines &/or Authorized Limits, [sic] - Employee's [sic] must understand their authorities and the accountability to maintain the integrity of all decisions made.

38

(Doc. 27-1 at 264) (emphasis in original).  The plaintiff argues that this language

> suggests that exceptions to the policy do and should occur, otherwise there would be no reason to have a policy governing the approval of exceptions or overrides, as exceptions or approvals would otherwise be strictly prohibited and there would be no need for the policy.

(Doc. 33 at 35).  The plaintiff has cited no <u>admissible</u>[13] evidence to support such an inference.  It is merely her <u>opinion</u> that this infraction may encompass <u>some</u> situations where <u>some</u> exceptions to policy are allowed.[14]   The plaintiff admits that the insurance check policy to which she failed to adhere contained no exceptions, and allowed for no exercise of judgment by the Branch Manager.

Further, the language of the infraction discusses no specific circumstances under which exceptions can be made, while at the same time making it clear that "Employee's [sic] must understand their authorities."  The plaintiff admits that "[t]he Performance Standard does not define the authority a Banking Center Manager, employed at the level of a Vice President may exercise."  (Doc. 33 at 35).  However, it is clear that that authority <u>was</u> defined in RBC's Insurance Claims Check policy,

---

[13]The plaintiff argues that Wood's declaration "confirmed . . . the accuracy of this interpretation."  (Doc. 33 at 35).  She then goes on to cite portions of Wood's declaration where he states that she exercised her judgment appropriately in this situation.  Because the court will strike the cited portion of Wood's declaration, this argument has not been considered.

[14]Even if <u>Wood's</u> statements were considered, they, too, are merely his unsupported <u>opinion</u> as to what the language means.  As noted in the court's ruling on the motion to strike, the language of the policy speaks for itself.

which the plaintiff admits she should have, but failed to follow.  That policy also provided: "Failure to follow the below procedures may result in Disciplinary Action per the advice and guidance of the HR Service Center up to and including termination." (Doc. 27-1 at 259) (emphasis added).  RBC acted in accordance with this policy in terminating the plaintiff.

The language of the infraction does not demonstrate the proffered reason is untrue.[15]

> **2.    *The Fact That the Plaintiff May Have Assessed the Risk to the Bank Before Endorsing the Check Does Not Demonstrate Pretext***

Parrott next argues that she properly endorsed the check because:

– her understanding of the Performance Standards policy is that exceptions and overrides are judgment calls made by management based upon an assessment of the risk to the bank;[16]

_____

[15]The plaintiff states, without explanation, that "the claim that the Bank bore the risk of a potential loss is demonstrably untrue and pretextual." (Doc. 33 at 34). This "conclusory position, unsupported by any specifics, does not create a question of material fact precluding summary judgment." *Jones v. Spherion Atl. Enter., LLC*, 493 F. App'x 6, 9 (11th Cir. 2012).  Further, as noted herein, the argument is irrelevant.

[16]In her argument section, the plaintiff does not state the basis for this "understanding." She cites to a portion of her affidavit which does not support the basis for such a position. The only other check cashing policy discussed in the record is the check cashing policy produced in discovery that states:  "Ultimately, the Manager has the authority to make all final decisions as to whether a check should be cashed or not… . When a client wants to cash a not on-us check, your decision will be influenced by the client's overall relationship with our Bank. Whenever there is a question about cashing a check, remember to review the client's overall relationship…" (Doc. 35-2 at 3).  Hedges stated that this policy did not apply to insurance checks.  His statement is the only evidence regarding the types of checks to which the policy applies.

– the customer was one with whom she had been familiar for many years, who also consistently maintained a significant assets on deposit with the Bank far exceeding the face value of the check she was asked to deposit, she had always demonstrated good character and integrity, and she and her family had a long-standing relationship with the Bank;

– she knew without hesitation that if Ms. Riha represented to her that the work for which the check she sought to deposit had been performed, without question it had been done; [and]

– the risk to the Bank was essentially nonexistent, because Parrott only approved the check for deposit, and not for purposes of negotiating a cash transaction.

(Doc. 33 at 36-37).  The plaintiff's argument is basically that she assessed the risk to the Bank, felt there was none, and endorsed the check.

Parrott's "understanding" of the Bank's policy and her authority, and what she did in furtherance of her erroneous understanding, does not demonstrate that the defendant's stated reason was false.  She admits that the Bank had a policy for the endorsement of the types of checks at issue.  She admits that the policy did not allow her to exercise discretion.  Indeed, the policy expressly stated that RBC's Retail Loan Operations in North Carolina, not the branch offices where she worked, or her, were to handle these types of settlement checks.  She admits that she should have, but did not, follow the policy.  What she did instead is irrelevant.

Similarly, whether there was any risk to the Bank, and whether the Bank suffered a loss, or even whether RBC was correct that she violated Bank policy, is not

the question.   The court does not

> analyze "whether employment decisions are prudent or fair. Instead [its]
> sole concern is whether unlawful discriminatory animus motivates a
> challenged employment decision." *Damon v. Fleming Supermarkets of
> Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999). Whether an employee
> actually engaged in the misconduct that was reported to the decision-
> maker is irrelevant to the issue of whether the decision maker believed
> that the employee had done wrong. *See Elrod v. Sears, Roebuck & Co.,*
> 939 F.2d 1466, 1470 (11th Cir.1991).

*Baker*, 372 F. App'x at 920.   Here, the plaintiff's subjective belief does not

demonstrate that the defendant was actually motivated by discriminatory animus

when it fired her for an admitted violation of policy.[17]

### 3.   *The Progressive Discipline Policy Was Not Mandatory*

The plaintiff next argues that the defendant's proffered reason is mere pretext

for discrimination because the defendant did not consider the plaintiff's work history

before she was terminated.   As noted above, on the Dismissal Summary Request

signed by Hedges, he wrote as the reason for dismissal: "[Banking Center]

Performance Standards Infraction #10." (Doc. 27-3 at 245).   This statement refers to

_____

[17]Again, Wood's statements regarding the plaintiff's exercise of her judgment in
endorsing the check (cited by the plaintiff at document 33, page 37) will be stricken and have not
been considered.   Further, Riha's statement in her declaration, confirming that representatives of
RBC visited her home and confirmed that the work had been completed, has not been
considered.   Although Riha states in her declaration that the Bank "sent inspectors out to my
home to inspect and make sure [the repairs] had been completed," (doc. 34-3 at 5) her statement
does not state whether that was done before or after the endorsement.   Further, even if it were
considered, in light of <u>all</u> the requirements that the plaintiff should have completed, but did not,
this <u>one</u> fact would not show pretext.

another form, created by RBC, which contains a "non-exclusive list of specific job performance infractions banking center employees must avoid, as well as the recommended corrective action steps to be taken by RBC management in response." (Doc. 27-1 at 263).  The recommended corrective action taken includes a written warning for the first occurrence, probation for the second occurrence, and dismissal for the third occurrence.  (Doc. 27-1 at 264).  The recommendation of "dismissal" has an asterisk which leads the reader to a note which reads: "Dismissal: Each situation will include a review of the circumstances and the employee's prior corrective action and performance record."  (Doc. 27-1 at 264.)

The plaintiff contends that, by the terms of the performance standards, before dismissing the plaintiff RBC was <u>required</u> to consider her past performance.  (Doc. 33 at 37-40).  However, the form is also very clear that "[t]hese Standards do not create a progressive disciplinary system, and RBC reserves the right at all times to exercise its full discretion, subject to the needs of the business under the particular circumstances, when following <u>or deviating</u> from these Standards."  (Doc. 27-1 at 263) (emphasis added).  "[W]hen an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in his case."  *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 873 (11th Cir. 2011). "Nevertheless, if management has discretion as to whether to follow the discipline

policy, then a failure to follow the policy does not show pretext." *Ritchie*, 426 F.

App'x at 873; *accord Dejarnett v. Willis*, 2:12-CV-846-MEF, 2013 WL 5526154 at

*12 (M.D. Ala. Oct. 4, 2013) (Fuller, J.); *Vertrees v. Am. Vulkan Corp.*, 8:10-CV-

2164-T-24, 2012 WL 95306 at *8  (M.D. Fla. Jan. 12, 2012) (Bucklew, J.); *Coleman

v. Alabama State Univ.*, 904 F. Supp. 2d 1245, 1259 (M.D. Ala. 2012) (Watkins, J.).

 In this case, the defendant clearly had discretion to deviate from its policy and

did so.  The deviation does not establish pretext.[18]

### 4. "Inconsistencies"

 Finally, the plaintiff attempts to point out inconsistencies to show pretext.  She

first writes that "Gary Wood concluded that the Dismissal Summary Request . . . was

misleading for several reasons," (doc. 33 at 40) and then quotes verbatim from

paragraph 10 of Wood's declaration where he states that it

> demonstrates that Mr. Hedge's testimony at pp. 95-99 of his deposition,
> wherein he claims that Human Resources was responsible for the
> decision to terminate Ms. Parrott, is untrue. The "Dismissal Summary
> Request" clearly shows that Hedges recommended her termination, that
> Human Resources "concurred" in the decision, and that Stafford
> approved that decision.

(Doc. 34-2 at 6-7).

 The court has determined that the above portion of Wood's declaration is due

---

[18]Further, the plaintiff has provided no comparator evidence of other employees who
engaged in the same conduct and were disciplined differently.

to be stricken.  However, even if the court entertains the <u>argument</u> that Hedges has been inconsistent about who recommended termination, pretext has still not been shown.

First, Hedges actually stated in his deposition that he was unclear whose recommendation it was to terminate the plaintiff but that he, HR, and Stafford all agreed with the recommendation.  (Doc. 27-3 at 125-126).  So, in fact, there is not an inconsistency.  Second, even if Hedges had been inconsistent, the inconsistency must relate to the proffered reason.  This court evaluates only whether the plaintiff has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions <u>in the employer's proffered legitimate reasons</u> for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997) (internal quotations and citations omitted)) (emphasis added).  Whether Hedges was correct about <u>who</u> recommended termination, demonstrates no inconsistency in the <u>reason</u> for the termination–the failure to abide by RBC regulations.  That reason has always been consistent.

The plaintiff next cites to Wood's declaration statement that the Dismissal Summary Request was "misleading" in that it stated that the plaintiff "cashed" the

check when it was only deposited.  (Doc. 33 at 40).[19]  The plaintiff writes that "a reasonable fact-finder might well conclude that Hedges exaggerated the allegations against Parrott in order to justify the imposition of harsher punishment."  (Doc. 33 at 40).  Such an argument is pure speculation, as there is no evidence the statement had any impact on the decision to terminate the plaintiff.[20]

Even if the plaintiff were successful in any of these attempts at showing that the proffered reason was false, "'a reason cannot be proved to be a 'pretext *for discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Baker v. Russell Corp.*, 372 F. App'x 917, 920 (11th Cir. 2010) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)) (emphasis in original).  Yet, the plaintiff has provided no evidence that age was the real reason she was terminated.

In her argument, the plaintiff points to the "hire-ahead" system of Hedges where he hired "managers-in-waiting" who were substantially younger.  (Doc. 33 at 41).  That fact alone does not show that the plaintiff was the victim of age

---

[19]Again, while the court will strike Wood's statement, it will consider the argument.

[20]As noted, the court will strike the Boackle affidavit, and its exhibits.  However, even if it did not, the additional argument that Hedges was "intentionally evasive" in his deposition does not demonstrate pretext.

discrimination.[21]

## IV.   CONCLUSION

Based on the foregoing, the motions to strike, will be **GRANTED**.  The entire

Boackle declaration and its exhibits, along with paragraphs 8, 10, 11, and 13 of

Wood's declaration, will be **STRICKEN**.  The motion for summary judgment will

be **GRANTED**, and this case will be **DISMISSED with prejudice**.

**DONE** and **ORDERED** this 5th day of December, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[21]The plaintiff also argues that "[s]imultaneously, a few months after assuming his role as Regional Manager, Hedges began terminating and or forcing the resignations of older loyal, long-term employees by placing them on performance improvement plans that were impossible to meet." (Doc. 33 at 41).  This "fact" and supporting evidence for this argument is found in plaintiff's proffered fact 15, which the court has not included because the plaintiff failed to follow its summary judgment scheduling order guidelines.  The argument will not be considered.

47